No. 24-2540

---

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

**MARGARET STARKS, Plaintiff-Appellant**

**v.**

**ST. LOUIS COUNTY, *et al.*, Defendants-Appellees.**

---

**On Appeal from the United States District Court,
Eastern District of Missouri
The Honorable Ronnie White, retired
No. 4:2021-cv-00435**

---

## REPLY BRIEF OF APPELLANT MARGARET STARKS

---

**Mark Pedroli  MO50787**
**Pedroli Law, LLC**
**7777 Bonhomme, Ste 2100**
**Clayton, MO 63105**
**Mark@PedroliLaw.com**
*Attorney for Appellant*

# TABLE OF CONTENTS

**TABLE OF CONTENTS** …………………………………………………….…..ii

**TABLE OF CITATIONS** ……………………………………………….......iii

**INTRODUCTION**…………………………………………………..……....1

**ARGUMENT** ……………………………………………………...…5

    I.    Appellant Adduced Sufficient Evidence to Demonstrate Actual Knowledge of a Serious Medical Condition and Deliberate Indifference by Appellees Officer Ivy, Nurse Tinoco, and Nurse Tucker…………………………………………………………...**5**

    II.    Appellant Adduced Sufficient Evidence to Demonstrate a Failure to Train, Supervise, or Discipline by Appellees Nurse Crancer, Nurse Hendrix, and St. Louis County, and for Appellants Municipal Liability Claim Against St. Louis County………………………………….**12**

    III.    Appellees Tinoco, Tucker, Crancer, and Hendrix are not entitled to seek dismissal from this Court related to a claim of violation of the statute of limitations without a developed district court record on the issue and without a district court order……………………………...................**16**

    IV.    Appellant does not require individual defendant liability to proceed to trial against Appellee St. Louis County for *Monell* Liability………..**23**

**CONCLUSION**………………………………………………………..**27**

**CERTIFICATE OF SERVICE** …………………………….….…...............**28**

**CERTIFICATE OF COMPLIANCE** …………………………………..**29**

# Table of Citations

*Bass v. SBC Communs., Inc*, 418 F.3d 870 (8th Cir. 2005) ………………..……...17

*Croffut v. United Parcel Serv., Inc., 575 F.Supp. 1264 (E.D.Mo.1984)*...............22

*Henry v. County of Shasta, 132 F.3d 512, 519 (9th Cir. 1997)*...............................10

*Hill v. John Chezik Imports*, 869 F.2d 1122, 1124 (8th Cir. 1989)...............………25

*Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991)……………………………4, 5

*Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002)……………………10

*McCrary v. Truman Med. Ctr.,* 916 S.W.2d 831, 833 (Mo. App. 1995)............19, 23

*Monceaux v. White*, 266 F. App'x 362, 366 (5th Cir. 2008)…………………………10

*Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807, (2005)........................22

*Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992)............................................24

*Smith v. McClammy*, 740 F.2d 925, 927 (11th Cir.1984) …………..…………..22

*Speer v. City of Wynne*, 276 F.3d 980, 985-86 (8th Cir. 2002)...............................24

*Thompson v. Comm'r of Soc. Sec. Admin.,* 919 F.3d 1033, 1036 (8th Cir. 2019)....22

*Turner v. Bowen*, 862 F.2d 708, 710 (8th Cir. 1988) ..………………………...........22

*Weiss v. Rojanasathit*, 975 S.W. 2d 113 (Mo. 1998)……………….…….……….19

*Wong v. Bowen*, 854 F.2d 630, 631 (2d Cir.1988) …..…..…..…...........................22

## Other Authorities

Eighth Amendment of the United States Constitution…………………………21, 24

Section § 334.104 RSMO……………………………………………………….…3

# INTRODUCTION

Appellant Margaret Starks hereby submits her Reply Brief to Appellees Reginald Tinoco, Debra Tucker, Rita Hendrix, and Fay Crancer ("Nurse Appellees[1]"), Appellee jail guard Cedric Ivy and St. Louis County.[2]

Appellees argue primarily that decedent Drexel Starks ("Starks") did not have a serious medical need, and nurses cannot have actual knowledge of a serious medical need if they don't "see" a patient, despite their knowledge of physician's treatment orders and surrounding circumstances. However, overwhelming evidence suggests that the Appellee jail nurses Tinoco and Tucker failed to treat Starks pursuant to the jail physician's orders despite knowledge of the substantial risks associated with Acute Withdrawal Syndrome ("*AWS*") and despite the jail's knowledge that Starks was vomiting and unable to ambulate, see his family members, lawyer or nurses. Evidence demonstrates that nurse Appellees Reginald Tinoco ("Tinoco") and Debie Tucker ("Tucker") knew Mr. Starks was prescribed two nursing assessments per day and medication three times per day. The medical evidence also demonstrates, in part, based on the testimony of former nurse manager Appellee Rita Hendrix ("Hendrix"), that the jail physician's standing orders were

---

[1] Nurse Appellees are covered by a third-party insurance policy and represented by insurance appointed counsel.
[2] Appellee St. Louis County and jail guard Cedric Ivy are represented by the St. Louis County Counselor's Office

created to prevent serious medical complications and death as a result of *AWS*. As such, all Appellees, including St. Louis County, knew the substantial risk of serious harm when ignoring patients on physician prescribed treatment orders for AWS.

Evidence also demonstrates that treating nurses Appellees Tinoco and Tucker, and Appellee jail guard Ivy, also violated St. Louis County's medical directive printed on the AWS assessment sheet that: **"Nurse MUST call inmate out to assess. NO CALL, NO SHOW not accepted. Officer MUST get inmate"**. *See Appellant's Opening Brief at 54.* Evidence, including the jail's own internal records recounting Appellee Ivy's own words just prior to Stark's death, demonstrate that Appellee jail guard Ivy ignored the policy mandating he escort Starks to the nurse's station or the nurses to Starks when the patient is too sick to ambulate on his own. *Id. at 38, 54,* Appellee nurse Tinoco also testified that he routinely ignored the medical directive and when a patient didn't "show" for his mandatory assessments, Tinoco would simply record it as a "refusal" rather than follow the "NO CALL, NO SHOW not accepted" policy.

St. Louis County was on notice of this pattern since at least March 2014 when Appellees supervisory nurses Hendrix and Crancer, created a Plan-To-Check Act ("*PDCA*") identifying and detailing the custom and pattern of their nurses ignoring physician's orders by not providing assessments and medications to patients like Starks. The March 2014 *PDCA* clearly identified the unconstitutional practice

*sixteen months* before Starks' death. But, as Appellee nurse manager Hendrix testified, while the pattern was identified, it was never truly addressed or resolved. App. 512, 532, 543; R. Doc. 344-5, at 85:9-20, 105:5-23, 116:4-11.

Appellee's supervisory nurses Hendrix and Crancer failed to train, supervise, or discipline St. Louis County employees and they were on notice of the *PDCA* and the unconstitutional custom of jail nurses not conducting twice daily assessments of patients diagnosed with AWS or distributing detainee's prescribed medications. These failures led to the remarkably predictable and preventable death of Mr. Starks. Indeed, Appellee Hendrix, the nurse manager at the time of Starks' death did not *discipline* anyone or create a single written record noting that Appellees Tinoco and Tucker ignored the jail doctor's order and the **"NO CALL, NO SHOW"** medical directive. Nurse Hendrix made it as it if never happened.

Indeed, Appellee Hendrix's supervision was so lacking, Appellant argues deliberately so, that she ensured no post-death investigation, or a Morbidity and Mortality Review was completed. St. Louis County policy CM-11, which *mandated* a Morbidity and Mortality Review ("MMR") or post-death investigation into the care provided to Starks, was also ignored by the Nurse Manager Appellee Hendrix[3]. Starks' cause of death was concealed so comprehensively that the identities of the

---

[3] Appellant has also argued the MMR was deliberately destroyed after completion

nurses responsible for treating Starks, Appellee Tinoco and Tucker, was concealed from Appellant for years and this concealment extended deep into the litigation[4].

Appellee St. Louis County was also on notice of and indeed perpetuated the same unconstitutional practice of nurses not providing prescribed medical assessments and medications and also including a second unconstitutional policy or practice of forbidding front line nurses from calling 911 when faced with a medical emergency without seeking permission from a supervisor. In this case, Tonia Dalcour was prevented from calling 911 for Starks during an obvious medical emergency. This policy or practice delayed Starks' emergency medical care at least thirty minutes after nurse Dalcour couldn't palpate Starks' pulse, find a blood pressure, or pulse oximeter readings. Starks' heart would stop beating within an hour of Nurse Dalcour's encounter. Both unconstitutional policies or practices were the moving force behind not only the *denial* of care (nurses' assessments and medication) but also the *delay* of emergency care that caused Stark's death.

---

[4] Indeed, St. Louis County corporate representative, former Nurse Manager Cathy Duffie identified the wrong nurse, Teresa Pierce, as failing to conduct the assessments and providing medication. Ironically, this same Nurse Manger also wrote an email to the St. Louis County Medical Examiner informing them that she was conducting "a Morbidity and Mortality Review" into Starks' death, but later testified at her deposition that she didn't actually conduct the review. Appellant believes the MMR was disposed of or not completed once the supervisors knew that the MMR might create liability for St. Louis County. App. 1594; R. Doc. 344-28, *passim*.

## ARGUMENT

**I.   Appellant adduced sufficient evidence to demonstrate actual Knowledge of a serious medical condition and deliberate indifference by appellees Jail Guard Ivy, Jail Nurse Tinoco, and Jail Nurse Tucker.**

Appellee nurses spend a significant portion of their responsive briefs suggesting that the mere lack of a diagnosis by a physician who orders treatment is sufficient to prove a lack of serious medical need. A serious medical need is *"one that has been diagnosed by a physician as requiring treatment,* or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention. (Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991). In this case, Mr. Starks was evaluated by Nurse Heitman, who was acting under the authority of orders from Dr. Gunn and Dr. Rottneck. However, the Appellees' response brief fails to acknowledge that the jail physicians had delegated their physician authority to diagnose Acute Withdrawal Syndrome ("AWS") to intake nurses, as well as delegating their authority to prescribe medications to nurses via standing orders. This is further substantiated by Missouri law, which allows nurses to diagnose on behalf of physicians within institutional settings, as seen in Starks' case. See MO. Rev. Stat. § 334.104 (2024). Defendants allege that "there was no evidence that Starks had ever been seen by a physician, or anyone qualified to make a diagnosis." (Appellees' Response on page 17, paragraph 2.) However, this claim ignores the operation of

institutional standing orders and the facility's own protocol, which was carried out by Nurse Heitman. Nurse Heitman was the intake nurse present acting on a standing physician order. Mr. Starks was therefore legally *diagnosed* by an acting physician as illustrated by *Johnson v. Busby.* Mr. Starks was placed on a withdrawal protocol that required Appellees Tinoco and Tucker to provide a) medical assessments twice a day at 0900 and 2100 and, to b) administer multiple medications including Clonidine, Folic Acid, Acetaminophen, and Emetrol to prevent dehydration three times per day at 0900, 1700, and 2100 hours. App. 307, R.Doc. 344-3, at 200:19-25, 201:1. All of these protocols were ordered by jail doctors, thus a serious medical need that was diagnosed by a physician that required specific treatment protocol.

Evidence demonstrates that all nurses in the treatment chain and all jail guards, including Appellees Tinoco and Tucker and Ivy, had actual knowledge that Starks was diagnosed with AWS. This knowledge was evident by Starks' medical records, his withdrawal checklist, nurse Broadwater's and Susman's assessments, jail records of Appellee Officer Ivy's comments, and the Medication Administration Record ("MAR"). App. 86; R. Doc. 344-1, passim. App. 107; R. Doc. 344-2, at 1. Plaintiff made a submissible case that Appellees Tinoco and Tucker had actual knowledge of Starks medical needs through IJMS records and other medical records including the nurses "call sheet" indicating which detainees were to be seen by nurse appellees Tinoco and Tucker on any given date. App. 55; R. Doc. 332-1, at 2. IJMS

Attachment 1 IJMS Journal, "Special Conditions: 1: Drug Detox". Appellees Tinoco and Tucker and Ivy all defied the medical directive to "get inmate" when he couldn't walk himself, despite having actual knowledge of Starks' physician mandated medication and treatment.

### *Reply to Appellee Officer Ivy*

Appellees St. Louis County and Officer Ivy spend most of their response re-establishing the procedural history of this litigation and defending the conduct of the nurse Appellees, even though the nurses are represented by separate insurance counsel. Officer Ivy raises only two arguments: first, that Ivy was unaware of any serious medical need, and second, that Ivy is entitled to qualified immunity.

Appellant demonstrated that Ivy was aware of Mr. Starks' serious medical need as established via the jail's IJMS records that show Ivy commented that Mr. Starks "refused to cooperate with medical, refused legal visit-told Ofc. Ivy that he was not getting up. Inmate was given a tray at lunch and he refused to eat." See County and Ivy Response Brief, citing Appellant's App. 1810; R. Doc. 350-2, at 6. This is despite the explicit jail policy "[n]o call, no show" for the nurses is "not accepted". However, this evidence demonstrates that Officer Ivy witnessed Decedent Starks in extreme distress, unable to get up to see a nurse, or to attend a legal visit. Additionally, "Encounter" notes in the Jail Medical Records and/or IJMS records, available to Appellee Ivy indicate that Starks was on the AWS or Clonidine

protocol. App. 1171; R. Doc. 344-9, at 22:11-25; *see also* App. 1172; R. Doc. 344-9, at 23:6-13. Finally, Officer Ivy was aware of Mr. Starks' diagnosis, his incapacity, his inability to get up and see his own medical providers; therefore, Ivy had actual knowledge of Mr. Starks serious medical need. "The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *See Farmer, 511 U.S. at 842, 114 S.Ct. 1970." Jones v. Minnesota Dept.*, 512 F.3d 478 (8th Cir. 2008).

With regard to the qualified immunity argument used by Appellee, the District Court declined to rule on the matter of qualified immunity. However, Appellant has explained in her opening brief that Appellant has adduced ample submissible evidence that Officer Ivy had first-hand knowledge of Starks' serious medical need, and this evidence is supported by the jail records, and the deliberate indifference demonstrated by Officer Ivy. Appellant's Opening Brief at 53.

### Reply to Appellees Tinoco & Tucker

Appellees jail nurses Tinoco and Tucker are similarly situated in this case, and their arguments are very similar, so Appellant will respond to arguments raised by Appellee nurses Tinoco and Tucker jointly. It is undisputed that appellees Tinoco and Tucker never visited with Mr. Starks prior to his death on August 6, 2015. Had

Appellees Tinoco and Tucker visited with Mr. Starks, conducted their assessments, and distributed medication as required, Mr. Starks' life could have been saved.

Appellee Tinoco and Tucker argue that Appellant has misled the Court by stating that Appellees Tinoco and Tucker were the only nurses conducting assessments on Mr. Starks floor on August 5th and 6th. Appellant has not misled the Court as evidence from the jail's "Event Schedule", which was belatedly produced by St. Louis County after years of litigation demonstrates that Appellees Tinoco and Tucker were the only staffers that signed into Starks' pod at the relevant times. As seen in the "Event Schedule" on August 5, 20215 at 19:48 the only nurse listed as "medical in HU (housing unit)" was "Nurse Reggie", or Appellee Reginald Tinoco. App. 1413; R. Doc. 350-3, at 7. As seen on August 6, 2015, at 10:03 the only nurse listed as "medical in HU" (housing unit) was "Nurse Tucker" who was the only nurse who "handed out meds" on that date. App. 1416; R. Doc. 350-3, at 2.

Appellees Tinoco and Tucker had actual knowledge that Mr. Starks was suffering from AWS. Mr. Starks' name was listed alongside other detainees on a list of those detainees to be assessed and provided medication. Appellees Tucker and Tinoco reviewed to this list to identify the patients that needed daily assessments. App. 1167; R. Doc. 344-9, at 18:4-24; *see also* App. 1168; R. Doc. 344-9, at 19:3-24. Finally, each floor has a "book" or list of all medical patients on that floor that nurses review before beginning their duties. App. 1219; R. Doc. 344-9, at 70:1-24.

Therefore, Appellant has adduced substantial evidence that Appellees Tinoco and Tucker had actual knowledge of Starks' serious medical need and Starks' need for medical assessments and medication to prevent, *inter alia*, a death from dehydration. Appellee Nurses, having actual knowledge of Mr. Starks medical needs and jail physician's orders, no-showed their patient, and Starks died shortly thereafter. Appellant's Opening Brief at 13-15.

As a result of this denial and interference with the physician's orders, for nearly *thirty-hours* Starks was denied his assessment and all medications. App. 54; R. Doc. 332-1, *passim.* No Appellee has denied that *AWS* is a serious risk and can quickly become fatal. However, it has been testified that employees do not treat AWS as a serious risk. Tinoco testified it was common for patients not to come to the nurses' cart for their assessment and medication, and still not be assessed by him despite the fact that the physician withdrawal checklist orders: "**Nurse MUST call inmate out to assess. NO CALL, NO SHOW not accepted. Officer MUST get inmate**." App. 1962, R. Doc. 390-1, at ¶12; *see also* App. 1964-65; R. Doc. 390-1 at ¶ 22. In fact, Appellee Tinoco admitted in deposition that he would not go into the cells of detainees who were unable or unwilling to come out to the nurses' station when called and would instead record these incidents as refusals. App. 1198; R. Doc. 344-9, at 49:9-23. This is evidence of Tinoco's deliberate indifference not only to all his patients who were too sick to walk, but also deliberate indifference to Starks.

Tinoco's deposition testimony is an explicit admission that he refused to treat Starks and routinely violated the "No call, No show" medical directive. Tinoco's testimony and admissions are substantial evidence that he was not only deliberately indifferent to Starks' serious and acute medical needs, but was routinely indifferent to patients proceeding Starks, as and this is relevant to Appellant's claims of failure to supervise or discipline against Appellee's Crancer and Hendrix and the unconstitutional custom or practice claim against St. Louis County. App. 1198; R. Doc. 344-9, at 49:9-23; App. 1201; R. Doc. 344-9, at 52:1-16. See *Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir. 1997) (holding that "post- event evidence . . . is highly probative" of a policy or custom), as amended on denial of reh'g by *Henry v. County of Shasta*, 137 F.3d 1372 (9th Cir. 1998).

"While deliberate indifference cannot be inferred from a prison official's mere negligence, it can be inferred from nurses who know of but disregard standing orders." *Monceaux v. White*, 266 F. App'x 362, 366 (5th Cir. 2008). See also, *Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002) (finding nurses deliberately indifferent after they disregarded a doctor's orders regarding inmate's treatment requirements). Here, by Appellee Tinoco and Tucker not adhering to physician's orders and not adhering to the "No Call, No Show Not Accepted" medical directive, there is substantial evidence that Appellee Nurses Tinoco and Tucker were

deliberately indifferent to Stark's serious medical need for his physician mandated treatment and medication, sufficient enough to be presented to a jury.

II. **Appellant adduced sufficient evidence to demonstrate a failure to train, supervise, or discipline by Appellees Nurse Crancer, Nurse Hendrix, and St. Louis County, and for Appellants municipal liability claim against St. Louis County**

*Reply to Nurse Crancer and Nurse Hendrix*

Appellee nurses attempt to argue that Appellant did not appeal Appellee Crancer, however, that is demonstrably false. As seen in Appellant's opening brief, Appellant argued that Appellee Crancer failed to supervise and discipline the nurses and officers [cite: 61, 64, and 66]. Appellee Crancer additionally argued that she was not in a supervisory role at the time of Mr. Stark's death. However, Appellee's contention that Appellee Crancer was not in the supervisory role is unsupported by their appendix, and indeed, Appellee Crancer does not even cite to an appendix page number and instead cite to a document that was stricken by the district court, which is improper. Therefore, making this contention completely unsupported. Even if Appellee Crancer wasn't the supervisor for Appellee Tinoco and Tucker on the day of Mr. Starks' death, she was not only a nurse supervisor prior to Mr. Starks' death, but she also had an actual knowledge and was a participant in the March 2014

PDCA. Which identified the problem distributing doctor ordered medication, and didn't resolve it.

Appellees additionally allege in their pleadings that Plaintiff misrepresented Rita Hendrix deposition testimony by arguing that Appellee Hendrix was saying there had been 20 AWS cases and not 20 AWS deaths. However, the deposition record is absolutely clear that these were references to deaths not just AWS cases as the response brief states. Respondents attempt to falsely accuse Appellant of misrepresenting the deposition testimony of Rita Hendrix. However, it is respondents who are misleading the Court. Plaintiff's counsel made it clear he was referring to deaths, not cases of AWS, in the deposition of Rita Hendrix. App. 743-45; R. Doc. 344-5, at 273-75.

> **"Q: How many times do you think somebody died who was on acute withdrawal syndrome…**
> **A: Whoa, whoa, whoa..[…..] Oh, more than ten, yes.**
> **Q: More than 20?**
> **A: Probably, yes…[….] It was – it was very common". App. 700; R. Doc. 344-5, at 273:13-24,** *see also* **App. 701; R. Doc. 344-5, at 274:1-19.**

Here, St. Louis County lawyers are asking the Court to disregard Ms. Hendrix's testimony, her credibility, and to not draw any inferences from her testimony. This is the role of a jury. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). The court must also "construe all facts and evidence in the light

most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant." *Cody v. Hastings*, No. 4:16 CV 1632 (JMB), 2018 WL 6830098, at n.1 (E.D. Mo. Dec. 27, 2018) citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

Appellee's Crancer and Hendrix additionally argue that because there is no underlying constitutional violation with Appellee's Tinoco and Tucker, they did not fail to train, supervise, or discipline. As argued above, there is an underlying constitutional violation against Appellee's Tinoco and Tucker, but even if a constitutional violation cannot be attributed directly to Tinoco or Tucker, a constitutional violation could have been committed by any municipal employee (defendant or not), including non-defendant nurse Dalcour, for Monell liability to attach to the nurse supervisors. "We have long held.. that a municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom. See *Praprotnik v. City of St. Louis*, 798 F.2d 1168, 1172 n.3 (8th Cir. 1986), rev'd on other grounds, 485 U.S.112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). Appellees' Crancer and Hendrix were put on notice of a pattern of nurses failing to distribute detainees their medication and did not train or supervise to ensure that this problem would not continue. Appellant has presented sufficient evidence of a failure to train, supervise,

or discipline against Appellee's Crancer and Hendrix that should be presented to a jury.

*Reply to St. Louis County*

Appellant has already proven that there was a pattern within the St. Louis County jail where nurses would not document assessments or give out prescribed medications. The District Court wrote in his March 5th, 2024 court order that "Plaintiff has shown that there was a pattern of nurses not documenting assessments, and that assessments were not always being completed, and comfort medications were not always given to inmates who were in acute drug withdrawal.". The District Court however, Appellant believes in error, ultimately concluded that there was no underlying constitutional violation due in large part to the District Court's analysis that physician standing orders prescribing a specific treatment and medication were not legally equivalent to a "doctor's diagnosis". However, had the District Court ruled that a physician did prescribe Mr. Starks treatment and medication and deliberate indifference to that treatment, it seems apparent by the remainder of the District Court's order that the District Court would have ruled St. Louis County had a custom and practice of not following jail doctor's orders, as supported by St. Louis County's March 2014 *PDCA*, admitting this custom and pattern existed. The District Court also wrote "indeed some of the facts of this case are **very troubling**". App. 1928; R. Doc. 384, at 37 [emphasis added].

III. **Appellees Tinoco, Tucker, Crancer, and Hendrix are not entitled to seek dismissal from this Court related to the statute of limitations without a developed district court record on the issue and without a district court order.**

Defendant "Nurses" (Tinoco, Tucker, Hendrix, and Crancer) claim that Plaintiff's claim is barred by the statute of limitations. However, Appellate Courts generally do not consider issues not ruled upon by the trial court. The District Court here did not rule on a motion to dismiss raising the statute of limitations. Also, in this case, there is a factual record that after St. Louis County misidentified the wrong nurse, Appellant dismissed that nurse and substituted Appellees Tinoco and Tucker, who were also represented by same insurance company lawyers who represented the misidentified nurse, Teresa Pierce. Moreover, as Appellant argued in response to Appellees Tinoco and Tucker's motion to dismiss at the District Court, there were various reasons Appellant could add these previously unknown parties to the litigation after the statute of limitations, including but not limited to the fact that St. Louis County concealed their identities for years and actively misled Appellant to believe other nurses were responsible. Appellant argued a series of factual arguments that needed to be further developed related to the propriety of substituting these parties, once discovered, as well as arguing that St. Louis County's active

concealment, for years, tolled the statute of limitations as to Appellees Tinoco and Tucker.

However, a responsive brief is the improper time to raise this matter in, as the statute of limitations was not a basis for the District Court's judgment. Appellee Nurses (Tinoco, Tucker, Hendrix, and Crancer) cite to "*Bass, 418 F3d.* at 873-73" as confirmation that the Court of Appeals can consider a matter not related to the District Court ruling. *See Nurses Reply Brief at 15-16.* However, *Bass v. SBC Communs., Inc* does not address this issue. Moreover, in a footnote, the District Court here points out that Appellee Nurses sought leave to file additional briefing on the issue of statute of limitations; this motion was denied. *See App. 1892; R. Doc. 384, at 1.* Therefore, the Court of Appeals should not entertain such an argument that was neither fully briefed nor comes with a fully developed factual record on the issue of notice of the complaint, mistake, substitution of parties, or equitable tolling due to government misbehavior.

Additionally, for respondents to argue that a 12(b)(6) motion without a factual record on the question of notice and tolling is not appropriate because there is no factual record of whether or not defendants had notice of the claims at the relevant time, and appellate courts do not create new factual records; therefore, remand to district court is the only available remedy for Appellee's request for relief. For

example, in Appellant's response to Appellee's motion to dismiss at the District Court, Appellant wrote:

> "Defendants' Hendrix, Crancer, Tinoco and Tucker have argued that the claims against them should be dismissed for reason of statute of limitations…Defendants have not cited any legal authority holding that Plaintiff had an obligation to anticipate that Defendants might raise this affirmative defense by alleging in her complaint that the Defendants a) received notice of Plaintiff's Complaint or c) knew that the action would have been brought against them but for a mistake in identity. Defendants have not cited any law suggesting such. Nor has Plaintiff's counsel found any such a legal requirement." R. Doc. 311, at 3.

The Court of Appeals reviews decisions, and the District Court has not ruled on Appellees statute of limitations arguments. Where the District Court has not addressed an issue raised by a party, the Court of Appeals will typically not entertain or consider new questions of fact in a response on appeal. Appellees filed a motion to dismiss, but the District Court did not rule. Additionally, Appellee Nurses have no factual record of their motion or responses to which they can cite, as they have not filed an Appendix in this case.

***Mistake, Government Concealment, and Equitable Tolling***

Appellant also argued mistake and equitable tolling at the District Court in response to Appellee's motion to dismiss. R. Doc. 311, *passim*. The overarching purpose of both equitable estoppel and equitable tolling is to "prevent a party from taking inequitable advantage of a situation" arising from the party's misconduct.

*Weiss v. Rojanasathit*, 975 S.W. 2d 113 (Mo. 1998) citing *McCrary v. Truman Med. Ctr.,* 916 S.W.2d 831, 833 (Mo. App. 1995). To allow Defendants, government employees at the time of Stark's death, to conceal evidence, including by deliberately not creating or destroying post-death investigations and jail location logs demonstrating which nurse was inside which pod at various times, would allow Appellees and St. Louis County to benefit from the concealment of evidence from the family of citizens who die in custody in the hopes of creating statute of limitations problems for litigants. St. Louis County was repeatedly accused of serious misconduct in this case and was even sanctioned early in the case for repeatedly refusing to produce documents in response to Appellant's discovery requests. R. Doc. 158, at 16.

The exceptional circumstances of this case, including past and current government misconduct, concealment, destruction or deliberate failure to create ministerial government records about the cause of patient's death is an exception to the affirmative defense of statute of limitations[5]. Plaintiffs provided the District Court with significant evidence supporting their claim that Defendants St. Louis County and some of the individual defendants engaged in a cover-up that began immediately after Mr. Stark's death. App. 1982; R. Doc. 195, at ¶3. Plaintiff will not

---

[5] The best summary of St. Louis County's comprehensive and obstructive litigation conduct can be found at App. 1981; R. Doc. 195*, passim, see also* R. Doc. 196-1.

reiterate the detailed evidence in Plaintiff's previous legal memorandums on this point.[6] However, in her March 10, 2023 *Motion and Memorandum for Sanctions*, for example, Plaintiff has presented this court, *inter alia*, with the following allegations:

- St. Louis County either willfully concealed the Morbidity and Mortality Review into the deaths of Mr. Starks or deliberately disregarded policies to create an MMR to avoid liability.

- St. Louis County willfully misled Appellant by wrongfully accusing Theresa Pierce as being the nurse solely responsible for Mr. Starks' medical care.
  R. Doc. 311, at 5.

In this case, Appellee St. Louis County's cover-up of critical information occurred in multiple ways: The Defendants refused to provide or destroyed the Morbidity and Mortality Review into Mr. Starks medical treatment at the jail. The record was mandatory to create and preserve pursuant to St. Louis County Corrections Medicine Policy CM-11. St. Louis County CM-11 also required Defendants to produce a final MMR report and send it to the Director of Public

---

[6] See the following previous filings by Plaintiff:
R. Doc 90: Plaintiff's Motion to Compel Discovery and for Sanctions
R. Doc 103: Plaintiff's Second MOTION to Compel by Plaintiff Margaret Starks.
R. Doc 308: Plaintiff's Second MOTION for Extension of Time to File Response/Reply

Health. St. Louis County either did not do it, or these communications were destroyed in an effort to spoliate evidence[7]. Appellee St. Louis County also concealed the identities of Appellee Tinoco and Tucker (and PDCA participants Appellee Hendrix and Crancer) until more than five years after Starks' death and deep into the litigation. St. Louis County deliberately concealed the names and information that would identify Appellees. St. Louis County concealed deep into discovery the jail "Event Schedule", a critical document, that immediately identified nurses Tinoco and Tucker, who entered Mr. Starks pod to treat patients on August 5 and August 6, 2015, except Starks because he could not walk to the nurses' station. Simultaneously, deep into the litigation, St. Louis County's 30(b)(6) representative, Cathy Duffie also misled Appellant into believing the nurse responsible was Theresa Pierce. As it turns out, Ms. Pierce was not responsible, Ms. Duffie later admitted that, forcing Appellant to dismiss her from this case and substituting Appellees Tinoco and Tucker. The government should never be allowed to benefit from concealing information about a citizen's in-custody death, but the government should especially not receive benefits from actively misleading parties in litigation.

---

[7] St. Louis County received television media inquiries about Starks' death immediately after it happened and County officials were communicating internally about how to respond. St. Louis County had ample motive to deliberately destroy or not create ministerial post-death investigations.

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Thompson v. Comm'r of Soc. Sec*. Admin., 919 F.3d 1033, 1036 (8th Cir. 2019)(quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005); see *Turner v. Bowen*, 862 F.2d 708, 710 (8th Cir. 1988) (per curiam) ("Generally, equitable circumstances that might toll a limitations period involve conduct (by someone other than the claimant) that is misleading or fraudulent.")." *Turner v. Bowen,* 862 F.2d 708 (8th Cir. 1988). In *Turner v. Bowen*, 862 F.2d 708 (8th Cir. 1988), the United States Court of Appeals for the Eighth Circuit explained the kinds of circumstances that can support an equitable tolling of the statute of limitations: Generally, equitable circumstances that might toll a limitations period involve conduct (by someone other than the claimant) that is misleading or fraudulent. *Smith v. McClammy*, 740 F.2d 925, 927 (11th Cir.1984) (Title VII case). "Equitable tolling thus far has been allowed only in those cases where the government has hindered a claimant's attempts to exercise her rights by acting in a misleading or clandestine way." *Wong v. Bowen,* 854 F.2d 630, 631 (2d Cir.1988) Turner, 862 F.2d at 710; see also, *Hill v. John Chezik Imports*, 869 F.2d 1122, 1124 (8th Cir. 1989). In *Croffut v. United Parcel Serv., Inc.*, 575 F. Supp. 1264 (E.D.Mo.1984), the Court held that equitable tolling is justified "where the court has led the plaintiff to believe all statutory requirements for bringing a suit

have been satisfied, or where the defendant's conduct lulls the plaintiff into inaction." Here, it's clear that St. Louis County lulled Plaintiff into inaction by not telling her the truth of how her son died and who was responsible for not providing him with doctor prescribed assessments and medication. To allow Defendants, government employees at the time of Stark's death, to hide behind the statute of limitations is to allow them to benefit from the fraudulent behavior that concealed their identities from Plaintiff in the first place.

Appellant herein has reiterated many arguments that the Appellant made with regard to Appellees St. Louis County's alleged litigation misconduct, notice, mistake and equitable tolling. The reason Appellant has reiterated these arguments within this appeal is to illustrate the factual complexity and the need for a trial court record to rule on the statute of limitations. Appellant believes that such a ruling should be taken by the District Court acting as the fact finder, which the District Court declined to do purposefully.

**IV.** **Appellant does not need to find liability against an individual defendant in order to proceed to trial against appellee St. Louis County for *Monell* liability.**

Lastly, even if this Court were to dismiss jail nurse Appellees Tinoco, Tucker, or jail nurse supervisors Appellee's Crancer or Hendrix related to the statute of

limitations, so long this is Court finds that Appellant adduced sufficient evidence that Starks' constitutional right was violated, then this Court can remand this case to the District Court for trial against St. Louis County, alone, (or St. Louis County and jail guard Ivy). "We have long held for that reason that a municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom. See *Praprotnik v. City of St. Louis*, 798 F.2d 1168, 1172 n.3 (8th Cir. 1986), rev'd on other grounds, 485 U.S.112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988); see also *Speer v. City of Wynne*, 276 F.3d 980, 985-86 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992). Indeed, Appellant never sued jail nurse Tonia Dalcour and didn't need to sue her to maintain a Monell claim against St. Louis County. Nurse Dalcour testified that she found Starks on the floor of his cell on August 6, 2016 at approximately 2:05 p.m. and, incredibly, she couldn't obtain a pulse, blood pressure or pulse oxygen levels for Starks. App. 1392, R. Doc. 332-17 at 92. Nurse Dalcour testified there was a *substantial and unexplained delay* in getting Starks to the infirmary, and Starks didn't arrive until 2:45 p.m, more than thirty minutes after Dalcour couldn't obtain vital signs. App. 1350-52; R. Doc. 332-17, at 50:5-52:17.[8] According to nurse

---

[8] Appellant inadvertently cited to the incorrect Record Document (R. Doc.) numbers in the table of contents of the appendix for her opening brief. The correct Record Document Number for Nurse Dalcour's deposition is R. Doc. 332-17, as cited above.

Dalcour, the policy or custom of St. Louis County forbade nurse Dalcour from calling 911 without first seeking approval from a medical provider, even during a medical emergency.; *see also* App. 1285-86; R. Doc. 344-9, at 137:17-19. As Nurse Dalcour testified, she wasn't allowed to call 911. App. 1375; R. Doc. 332-17, at 75:7-16. Additionally, as Appellant alleged in her Fourth Amended Complaint:

> "On information and belief, Defendants St. Louis County and Khan maintained a **policies, practices, and/or customs which required jail staff obtain permission from multiple supervisors and/or supervisory officers before they were allowed to: transfer a detainee to the infirmary for urgent medical care; call 911**; call for outside EMS; and/or arrange emergency transport to a hospital, which thereby **delayed and/or prevented detainees from receiving urgent and necessary medical care and treatment**." App. 19; R. Doc. 269, at ¶125. [emphasis added]

"When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). Here, the effect of delay is Starks dying. Starks' heart stopped beating in the jail's infirmary within an hour after the delay caused by nurse Dalcour not being allowed to call 911. App. 98; R. Doc. 334-1, at 4. Starks would ultimately die of dehydration and cardiac dysrhythmia, caused by untreated withdrawal. App. 1553; R. Doc 344-17, at 19. A quick response and

intravenous fluids could have saved his life. Instead, after nurse Dalcour left his cell, he languished for more than another 30 minutes alone.

Even this District Court stated that Starks was suffering from a critical medical condition as a result of the symptoms of Acute Withdrawal Syndrome that Starks was experiencing on the afternoon of August 6, 2015. The District Court stated "...symptoms from Acute Withdrawal Syndrome, such as vomiting and diarrhea, can create a serious medical condition and it is clear from the record that sometime after 2:00 p.m. on August 6, 2025, Mr. Starks' medical condition was **critical**, and **he needed urgent medical care**." [emphasis added] App. 1908-09, R. Doc. 384, at 17-18. St. Louis County's policy and practices, as testified to by nurse Dalcour, prevented her from calling 911 when Starks needed urgent medical care.

Whether ignoring physicians' orders (*nurse Tinoco and Tucker*), ignoring Starks' inability to ambulate, see his lawyer or nurses (*Office Ivy*), or not calling 911 when it was clear that Starks had an acute, emergency medical need (*Nuse Dalcour*), Starks' constitutional rights were violated at the St. Louis County jail, and he died as result. If this Court rules Starks' constitutional rights were not violated by Appellee Tinoco or Tucker, this Court can nonetheless still rule that Starks' constitutional rights were violated when he was ignored and 911 wasn't called during an acute medical emergency on August 16, 2024 at 2:00 p.m. Starks was

ignored and left alone in his cell for *more than thirty minute*s after nurse Dalcour tried but couldn't obtain a pulse, blood pressure, or oxygen saturation vital signs. Nurse Dalcour admitted and agreed in her deposition that Starks' delay in medical treatment during an acute medical emergency was "substantial" and "unexplained".

Each of the jail's discrete constitutional violations (failure to provide prescribed treatment and medication <u>and</u> failure to call 911 or render emergency care) was a result of unconstitutional customs and practices of St. Louis County. Appellee St. Louis County's unconstitutional customs and practices were the moving force behind each violation of Starks' constitutional rights and liability against an *individual Appellee* is not necessary to vindicate Appellants claims against Appellee St. Louis County.

## <u>CONCLUSION</u>

Appellant prays that this Honorable Court reverse the District Court's grant of summary judgment in favor of Appellees Tinoco, Tucker, Ivy, Hendrix, Crancer and St. Louis County, and remand this case back to the District Court for trial.

Dated: May 19, 2025

_____

Mark J. Pedroli, MBE 50787
*PEDROLI LAW, LLC*
7777 Bonhomme Ave, Suite 2100
Clayton, Missouri 63105
314.669.1817
314-789.7400 Fax
Mark@PedroliLaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 19th day of May, 2025, a true and accurate copy of the foregoing was filed electronically with the Clerk of this Court, through the Courts CM/ECF system, with notification and service of the same sent to all counsel of record via operation of that system.

/s/ Mark J. Pedroli

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief complies with FED. R. APP. P. 32(7)(B) in that it uses a proportionally spaced typeface containing serifs, Times New Roman, 14-point font. The undersigned further certifies that, based upon the word count function in Microsoft Word, the foregoing brief complies with FED. R. APP. P. 32(7)(A) in that it contains 6,481 words excepting those portions excluded under the federal rules. The undersigned finally certifies that the foregoing is virus free.

/s/ Mark J. Pedroli